Todd C. Tucci, *pro hac vice*
Idaho State Bar # 6526
**ADVOCATES FOR THE WEST**
P.O. Box 1612
Boise, ID 83701
(208) 342-7024
ttucci@advocateswest.org

Elizabeth Potter, *pro hac vice*
Oregon Bar # 105482
**ADVOCATES FOR THE WEST**
3701 SE Milwaukie Ave., Ste. B
Portland, OR 97202
(503) 914-6388
epotter@advocateswest.org

*Attorneys for Plaintiffs*

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF ARIZONA**

| | | |
|---|---|---|
| Western Watersheds Project; Center for Biological Diversity; and Sierra Club, | ) ) ) | No. |
| Plaintiffs, | ) ) | |
| vs. | ) ) | COMPLAINT |
| Anthony (Scott) Feldhausen, BLM Gila District Manager; Raymond Suazo, BLM Arizona State Director; and Bureau of Land Management, an agency of the United States, | ) ) ) ) ) | |
| Defendants. | ) ) ) | |

**INTRODUCTION**

1.      Plaintiffs Western Watersheds Project, Center for Biological Diversity and Sierra Club challenge Federal Defendants' unlawful decisions to authorize and expand livestock grazing, vegetation treatments, and other actions that will harm the aquatic, riparian, wildlife, and conservation values of the San Pedro Riparian National Conservation Area ("San Pedro Riparian NCA" or "SPRNCA"), and violate bedrock

1

environmental laws including the Arizona-Idaho Conservation Act of 1988, Federal Land Policy and Management Act, National Environmental Policy Act, and Administrative Procedure Act.

2.      In 1988, Congress created and designated the San Pedro Riparian NCA – the nation's first riparian NCA – which included more than 46 miles of the San Pedro and Babocomari Rivers, and nearly 55,000 acres of riparian areas and uplands within the NCA.  The San Pedro Riparian NCA contains four of the rarest habitat types in the American Southwest (cottonwood/willow forests, marshlands, grasslands, and mesquite bosques), and provides habitat for approximately 350 birds, 50 species of reptiles and amphibians, and more than 80 species of mammals, making this area one of the richest assemblages of land mammal species in the entire world.

3.      In creating and designating the San Pedro Riparian NCA, Congress required the Secretary of the Interior to manage these lands and waters to "conserve, protect, and enhance" the riparian, aquatic, wildlife, scientific, recreational and other conservation values in the area.  16 U.S.C. §§ 460xx (Arizona-Idaho Conservation Act).[1]

4.      To fulfill this obligation, the Bureau of Land Management ("BLM") has prohibited livestock grazing on most of the San Pedro Riparian NCA for the past thirty years, with the exception of several thousand acres the agency acquired through a land exchange in 1987.  The agency has permitted livestock grazing on these acquired lands for decades – without an overarching management plan that addresses its effects – despite mounting evidence that cattle degrade ecological conditions and that current management is insufficiently protective of riparian and conservation resources.

---

[1]  The Secretary of the Interior has delegated to the BLM Arizona State Director the responsibility and authority to approve resource management plans, amendments, revisions and related environmental impact statements on the San Pedro Riparian NCA. *See* 43 U.S.C. 1609.0-4; BLM Manual 1203 – Delegation of Authority.

2

5.     In 2019, Federal Defendants BLM *et al.* approved a Final Environmental Impact Statement, Record of Decision and Approved Resource Management Plan for the San Pedro Riparian NCA, which allow expanded livestock grazing and expansive vegetation treatments within the San Pedro Riparian NCA.  BLM's own analysis and other record evidence shows, however, that the approved livestock grazing and vegetation treatments will undermine the conservation values for which Congress protected the San Pedro Riparian NCA, including by harming the aquatic, riparian and wildlife values of the Babocomari and San Pedro Rivers and surrounding uplands, in direct contravention of the requirements of the Arizona-Idaho Conservation Act and the Federal Land Policy and Management Act, 43 U.S.C. §§ 1701 *et seq.* (FLPMA).

6.     BLM has also violated the National Environmental Policy Act, 42 U.S.C. §§ 4321 *et seq.* (NEPA), by failing to first examine the direct, indirect and cumulative impacts on the conservation values of the San Pedro Riparian NCA of BLM's grazing authorizations, together with BLM's separate so-called targeted grazing authorizations, and the extensive mechanical, herbicide and grazing treatments BLM has permitted across the SPRNCA.

7.     Accordingly, immediate injunctive and/or declaratory relief is required to ensure that BLM adheres to the requirements of law – to "conserve, protect, and enhance" – in managing the public lands and waters within the San Pedro Riparian NCA, and to prevent further and irreparable harm to riparian, aquatic, wildlife and other conservation values resulting from Federal Defendants' unlawful actions.

**JURISDICTION AND VENUE**

8.     Jurisdiction is proper in this Court under 28 U.S.C. § 1331 because this action arises under the laws of the United States, including the Arizona-Idaho Conservation Act, FLPMA, NEPA, the Administrative Procedure Act, 5 U.S.C. §§ 701

*et seq*. (APA); the Declaratory Judgment Act, 28 U.S.C. §§ 2201 *et seq*.; and the Equal

Access to Justice Act, 28 U.S.C. §§ 2412 *et seq.* (EAJA).

9.      Venue is properly vested in this Court under 28 U.S.C. § 1391(e) because

Federal Defendant BLM has offices in this district, and a substantial part of the events or

omissions giving rise to the claim occurred in this district and division.

10.     An actual, justiciable controversy now exists between Plaintiffs and Federal

Defendants, and the requested relief is therefore proper under 28 U.S.C. §§ 2201-02, and

Federal Defendants have waived sovereign immunity pursuant to 5 U.S.C. § 701.

## **PARTIES**

11.     Plaintiffs in this action are as follows:

A.      WESTERN WATERSHEDS PROJECT ("Western Watersheds") is a non-

profit corporation founded in 1993, which is headquartered in Idaho and has additional

offices or staff in Arizona, California, Idaho, Wyoming, Montana, Nevada, and Oregon,

and is dedicated to protecting and conserving the public lands and natural resources

across the American West. Western Watersheds' board members, staff, and members

regularly seek out the public lands and wildlife in the San Pedro Riparian NCA for

recreational, scientific, educational and other pursuits, and intend to continue to do so in

the future. Western Watersheds has long-standing interests in preserving and conserving

the wildlands and wildlife in the San Pedro Riparian NCA.

B.      CENTER FOR BIOLOGICAL DIVERSITY ("the Center") is a non-profit

organization dedicated to the preservation, protection, and restoration of biodiversity,

native species, and ecosystems. The Center was founded in 1991 and is based in Tucson,

Arizona, with offices or staff throughout the country.  It has more than 70,000 members,

including many who reside in, explore, and enjoy the native species and ecosystems of

southern Arizona, including the San Pedro Riparian NCA.  The Center is actively

involved in species and habitat protection issues worldwide, including throughout the

western United States, and continues to actively advocate for increased protections for wildlands and wildlife across the American West, including the San Pedro Riparian NCA.  The Center's board members, staff, and members regularly seek out the public lands and wildlife in the San Pedro Riparian NCA for recreational, scientific, educational and other pursuits, and intend to continue to do so in the future. The Center has long-standing interests in preserving and conserving the wildlands and wildlife in the San Pedro Riparian NCA.

C.     SIERRA CLUB is a national nonprofit organization of approximately 780,000 members dedicated to exploring, enjoying, and protecting the wild places of the earth; to practicing and promoting the responsible use of the earth's ecosystems and resources; to educating and enlisting humanity to protect and restore the quality of the natural and human environment; and to using all lawful means to carry out these objectives. The Sierra Club's Arizona Chapter, known as the Grand Canyon Chapter, has approximately 16,000 members, including members who live in Cochise County and recreate in the San Pedro Riparian NCA. Sierra Club members use the public lands within the San Pedro Riparian NCA for quiet recreation, aesthetic pursuits, and spiritual renewal.

12.     The public land and waters of the San Pedro Riparian NCA are of great concern to Plaintiffs and their board members, staff, members, and supporters; and the conservation, protection and enhancement of these lands, waters, and wildlife habitat are highly important to Plaintiffs and their board members, staff, members, and supporters.

13.     Plaintiffs' board members, staff, members, and supporters recreate throughout the public lands and waters of the San Pedro Riparian NCA; and they regularly and routinely visit and utilize the SPRNCA and plan to continue to do so in the future.  Plaintiffs' members, supporters, and staff derive recreational, aesthetic, scientific, inspirational, educational, and other benefits from these activities and have an interest in

preserving the possibility of such activities in the future.  Their use and enjoyment of the SPRNCA depends on its sound management to conserve, protect and enhance the aquatic, riparian, wildlife and conservation resources of the NCA.

14.    Plaintiffs' board members, staff, members, and supporters have actively participated in the BLM's management of the San Pedro Riparian NCA since its inception, and have attended public hearings, submitted scoping comments, protested and appealed BLM's decisions that fail to adhere to the bedrock legal requirements, and have been to and visited the San Pedro Riparian NCA on hundreds of occasions. Plaintiffs have exhausted all legally required administrative remedies before bringing this action.

15.    Defendants' violations of NEPA, FLPMA, APA, and the Arizona-Idaho Conservation Act and other provisions of law in adopting the Final Environmental Impact Statement and Proposed Resource Management Plan (FEIS), and Record of Decision and Approved Resource Management Plan (ROD) for the San Pedro Riparian NCA have injured the aesthetic, conservation, scientific, recreational, educational, wildlife preservation, procedural, and other interests of Plaintiffs and their board members, staff, members, and supporters.  These are actual, concrete injuries caused by Defendants' violations of law, for which judicial relief is required to remedy those harms.  The relief sought herein would redress these injuries.  Plaintiffs have no adequate remedy at law.

16.    DEFENDANT ANTHONY (SCOTT) FELDHAUSEN is the BLM Gila District Manager.  As the District Manager, Feldhausen has management and supervisory authority over the issuance of the challenged decisions, and Feldhausen is responsible for ensuring that activities within the Gila District comply with all federal laws and regulations, including NEPA, FLPMA, and the Arizona-Idaho Conservation Act. Defendant Feldhausen oversaw, supervised, and disseminated the FEIS challenged herein.  Defendant Feldhausen is sued solely in his official capacity

17.     DEFENDANT RAYMOND SUAZO is the BLM Arizona State Director, and signed the ROD challenged here.  Suazo is sued solely in his official capacity.

18.     DEFENDANT BUREAU OF LAND MANAGEMENT is an agency or instrumentality of the United States, within the Department of Interior. BLM is charged with managing the public lands and waters of the San Pedro Riparian NCA in accordance and compliance with all federal laws and regulations.  BLM approved the FEIS and ROD challenged here.

## FACTUAL AND LEGAL BACKGROUND

### I.     The San Pedro Riparian National Conservation Area

19.     On November 18, 1988, President Ronald Reagan signed the Arizona-Idaho Conservation Act, establishing 56,431 acres of public lands and waters as the San Pedro Riparian NCA, our nation's first riparian national conservation area. The San Pedro Riparian NCA starts at the U.S.-Mexico border and continues north approximately 47 miles along the San Pedro River.  The following figure illustrates the location and public lands designated as the San Pedro Riparian NCA.

Figure 1-1
San Pedro Riparian
National Conservation Area

San Pedro Riparian National Conservation Area
Proposed RMP/Final EIS

April 2019                                                                      A-1

20.     The San Pedro Riparian NCA contains four of the rarest habitat types in the Southwest: cottonwood/willow forests, marshlands or cienegas, big sacaton grasslands, and mesquite bosques (forests).  The San Pedro Riparian NCA is a Globally Important

Bird Area that attracts birders from all over the world, and the riparian area along the San Pedro River provides habitat for more than 350 species of birds. Two hundred and forty of these species are neotropical migrants that winter in Mexico or further south and breed during the summer months in the United States and Canada.  Up to four million birds annually depend on the SPRNCA river corridor during their migrations.

21.    The San Pedro River originates in desert grasslands near Cananea, Sonora, Mexico, and enters the United States near Palominas, Arizona.  The river flows through the SPRNCA to Winkelman, Arizona, for a total of 140 miles, where it flows into the Gila River, which flows west into the Colorado River.  The San Pedro River contains two primary tributaries (Babocomari River and Aravaipa Creek); it drains approximately 4,720 square miles in Santa Cruz, Cochise, Graham, Pima and Pinal Counties; it flows through deep sedimentary basins of volcanic rocks surrounded by nine separate mountain ranges (Huachuca, Mule, Whetstone, Dragoon, Rincon, Winchester, Galiuro, Santa Catalina, and Tortolita Mountains); and its health is critical to the entire downstream hydrologic ecosystem.

22.    Throughout the San Pedro Riparian NCA, BLM has documented more than 10,000 acres of sensitive soils, which are soils with characteristics that make them extremely susceptible to erosion and difficult to conserve, protect, or enhance after disturbance.  These soils are found along the lower Babocomari River, on the uplands to the east of the confluence of the Babocomari and San Pedro Rivers, and in the uplands in the Brunckow grazing allotment.

23.    The San Pedro Riparian NCA also contains varied landforms, soil types and slopes, with the steeper slopes up to 70 percent occurring on the granitic hills in the northern portion and ranging up to 40 percent on the so-called "limy uplands" in the southern two-thirds of the NCA. The uplands of the NCA provide habitat for numerous wildlife and plant species and are integral to the health of the watershed.

9

24.     The SPRNCA also contains significant riparian areas and habitat, including 12,320 acres of riparian habitat and vegetation. Riparian areas and vegetation play a critical role in providing habitat for the diversity of species found throughout the NCA. These areas also function to support overall watershed health by slowing water velocity during floods, aiding in overbank flow and aquifer recharge, capturing sediments, increasing infiltration and soil-moisture retention by adding organic matter, providing riverbank stability, and preventing stream channel degradation.

25.     The SPRNCA contains eight wetland areas totaling 260 acres of wetlands, and these areas provide important wildlife habitat, play an important ecological role in reducing erosion and improving water quality, and also improve floodwater retention and ground water recharge. BLM considers wetlands to be priority wildlife habitat. Much of this habitat type has been lost entirely or diminished in size, both within the SPRNCA and across the desert southwest.

26.     The SPRNCA also provides habitat for more than 80 species of mammals – one of the richest assemblages of land mammal species in the world – and 50 species of reptiles and amphibians have also been found within the boundaries of the SPRNCA. The SPRNCA provides habitat and critical habitat for 18 species of federally protected (or proposed) threatened and endangered species, including the endangered Huachuca water umbel (a native, aquatic plant), southwestern willow flycatcher, desert pupfish, Gila topminnow, jaguar and ocelot; as well as the threatened northern Mexican gartersnake and yellow-billed cuckoo.

27.     Congress included within the SPRNCA boundary the lands BLM had then-recently acquired through a land exchange with the Arizona State Land Department on April 21, 1987, which brought the lower stretch of the Babocomari River and riparian areas and uplands to the east of the San Pedro River into public ownership under BLM management.

10

## II.      Arizona-Idaho Conservation Act and Other Applicable Laws

28.      In addition to establishing and designating the SPRNCA, the Arizona-Idaho Conservation Act requires BLM to manage the SPRNCA "in a manner that conserves, protects, and enhances the riparian area and the aquatic, wildlife, archeological, paleontological, scientific, cultural, educational, and recreational resources of the conservation area." 16 U.S.C. § 406xx(a).  In addition, BLM is required to ensure that any and all uses of the SPRNCA "will further the primary purposes for which the [SPRNCA] is established."  *Id.*

29.      Congress also required BLM to develop within two years after enactment of the Arizona-Idaho Conservation Act – by March 12, 1990 – a comprehensive plan for the long-term management and protection of the San Pedro Riparian NCA, and Congress required that the management plan "shall contain provisions designed to assure protection of the riparian area and the aquatic, wildlife, archeological, paleontological, scientific, cultural, educational, and recreational resources and values of the conservation area."  *Id.* at § 406xx-2(a).

30.      The Arizona-Idaho Conservation Act also requires that BLM "shall only allow uses of the conservation area as [it] finds will further the primary purposes for which the conservation area is established."  *Id.* at § 460xx-(1)(b).  The statute requires that management of the SPRNCA be guided by the requirements of the Act, and "where not inconsistent with [the Arizona-Idaho Conservation Act], by the provisions of [FLPMA.]."  *Id.* at § 460xx-1(a).

31.      FLPMA requires BLM to manage the federal public lands under a multiple use and sustained yield regime, which means "management of the public lands and their various resource values so that they are utilized in the combination that will best meet the present and future needs of the American people."  43 U.S.C. §§ 1701(a)(7), 1702(c), 1712(c)(1), 1732(a).  This "multiple use" management paradigm is expressly limited,

1   however, "where a tract of such public lands has been dedicated to specific uses

2   according to any other provisions of law." 43 U.S.C. § 1732(a).  When a separate statute

3   elevates conservation over multiple use, for example, BLM "shall" manage the public

4   lands "in accordance with such law."  *Id.*

5        32.   BLM is also required to comply with NEPA when managing the San Pedro

6   Riparian NCA.  NEPA is our "basic national charter for protection of the environment."

7   40 C.F.R. § 1500.1(a).  It "declares a broad national commitment to protecting and

8   promoting environmental quality." *Robertson v. Methow Valley Citizens Council*, 490

9   U.S. 332, 348 (1989); *see* 42 U.S.C. § 4331.  NEPA requires federal agencies to study the

10   environmental impacts of proposed actions and the reasonable alternatives that would

11   avoid or minimize such impacts or enhance the quality of the human environment. 42

12   U.S.C. § 4332(2)(C); 40 C.F.R. Pt. 1502.

13        33.   Aimed at informed agency decision-making and meaningful public

14   participation, NEPA's "action-forcing" procedures require agencies to, among other

15   things, properly define proposals, develop a reasonable "purpose and need" statement to

16   frame the environmental review, consider a reasonable range of alternatives, establish an

17   accurate baseline for analysis, ensure the professional and scientific integrity of their

18   discussions and analyses, include all information that is "essential to a reasoned choice,"

19   and discuss mitigation measures including the effectiveness of those measures.  *See*, *e.g.*,

20   40 C.F.R. §§ 1500.1(b), 1500.2(b), 1502.1, 1502.4(a), 1502.13, 1502.15 1502.22(a),

21   1502.24, 1508.20.

22        **III.   Livestock Grazing in the San Pedro Riparian NCA**

23        34.   Since its designation in 1988, BLM has prohibited livestock grazing on the

24   vast majority of the SPRNCA.  Yet, BLM and others have repeatedly documented

25   trespass grazing – i.e., grazing on federal public lands that are closed to grazing, or

26   otherwise grazing without a valid permit – within the SPRNCA.

35.     For decades, BLM has not applied this grazing prohibition to the lands acquired in the 1987 land exchange with the State of Arizona, including federal lands within the Babocomari, Brunckow Hill, Lucky Hills, and Three Brothers allotments, which Congress included within the boundaries of the SPRNCA.  At the time these lands were acquired by BLM, the Arizona State Land Department had issued standard 10-year grazing leases on these areas, which were due to expire in 1996. Since that time, BLM has continued to allow grazing on the allotments without analyzing the environmental impacts of such grazing, determining whether such grazing was consistent with the Arizona-Idaho Conservation Act, or crafting a management plan to govern such grazing.

36.     The figure below illustrates the location of these four grazing allotments within and immediately outside the Congressionally-designated boundaries of the SPRNCA:

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24



**Figure 2.4-3. Grazing Allotments**

25    37.    The Babocomari Allotment contains 11,512 acres of state, federal and

26  private lands, including 1,865 acres of BLM-managed lands within SPRNCA, and it is

located adjacent to the San Pedro River. The majority of the allotment is relatively flat, except for the southeast corner of the allotment within the SPRNCA, which has steeper slopes and well-defined drainages running toward the Babocomari River.  The allotment has been fenced into five pastures. Four miles of the Babocomari River runs through the southeastern portion of the allotment within the SPRNCA.  BLM allows the current permittee to run a total of 165 animal unit months (AUMs[2]) year-round on the SPRNCA portion of the allotment.

38.    The Brunckow Hill allotment contains 1,923 acres of state, federal and private lands, including 974 acres of BLM-managed lands within the SPRNCA. The San Pedro River is located near the western boundary of the allotment, and all of the allotment's uplands drain into the river.  The allotment contains two pastures, and BLM permits 84 AUMs in the allotment, including 64 AUMs within the SPRNCA.

39.    The Lucky Hills allotment contains 20,998 acres of state, federal and private lands, including 1,728 acres of BLM-managed lands in the SPRNCA.  This allotment lies to the east of the San Pedro River, and it contains vast portions of uplands to the east of the river, which drain into the San Pedro River.  The two-mile portion of the western boundary of the allotment is unfenced, and there is no fence separating the riparian and wetland areas within the SPRNCA from the uplands to the east.  BLM currently authorizes yearlong grazing within the allotment, and the permittee is authorized to run 1,080 AUMs on the Lucky Hills allotment, including 197 AUMs with the SPRNCA.

40.    The Three Brothers Allotment contains 9,227 acres of state, federal and private lands, including 2,280 acres within SPRNCA, and it is located to the east of the San Pedro River. The majority of the allotment is relatively flat, except for the

---

[2]   An Animal Unit Month or AUM is equal to the amount of forage one cow or one cow-calf pair consumes in one month (43 CFR § 4100.0-5), and is generally considered to be equivalent of 1,000 pounds of forage.

southwestern corner of the allotment, which contains the Three Brothers Hills and other steeper slopes and well-defined drainages running toward the San Pedro River.  BLM authorizes the current permittee to run livestock year-round on the allotment, and allows 192 AUMs on the allotment, including 162 AUMs within the SPRNCA. There is no fence delineating between lands within and outside the SPRNCA, and a 2.5-mile portion of the western boundary of the allotment remains unfenced.

41.     Upon information and belief, BLM manages livestock on some or all of these allotments through decades-old "Cooperative Resource Management Plans" ("Cooperative RMPs"), which are private agreements between BLM, the permittees and other parties.  Plaintiffs have never been invited to participate in these Cooperative RMPs, despite being interested public, and, upon information and belief, BLM has never prepared any NEPA documentation or analysis for these plans.

42.     BLM and others have repeatedly documented livestock trespass from private or state lands outside the SPRNCA into the grazing allotments within the SPRNCA, and BLM has concluded that this trespass grazing has adversely impacted the riparian areas and wildlife habitat in the SPRNCA.

**IV.     SPRNCA Riparian Management Plan and Other Management Plans**

43.     For nearly thirty years, BLM managed the public lands and waters in the San Pedro Riparian NCA under two different management plans, neither of which examined the impacts of permitting livestock grazing on public lands and waters within the SPRNCA, or whether livestock grazing was consistent with the statutory requirements to protect, conserve and enhance the conservation values of the SPRNCA.

44.     In 1989, BLM issued the first of these plans—the San Pedro Riparian Management Plan ("1989 Riparian Plan") – which addressed only 47,668 of the 56,431 acres of public lands and waters within the SPRNCA.  Under the 1989 Riparian Plan, BLM prohibited livestock grazing within those 47,668 acres of the SPRNCA for the life

16

of the plan in order to protect the riparian and conservation resources of the SPRNCA. BLM also permitted dispersed and developed recreation insofar as it avoided all impacts to the abundant natural, cultural and paleontological resources within SPRNCA. BLM restricted vehicles to designated roads, prohibited the discharge of firearms, and identified a series of other restrictions to ensure that all actions will adhere to the statutory requirement to "conserve, protect, and enhance" quality and quantity of the aquatic, riparian, wildlife and other conservation values in the area.

45.     In the 1989 Riparian Plan, BLM refused to address the recently acquired state and private inholdings, including the federal lands within Babocomari, Three Brothers, Lucky Hills, and Brunckow Hill allotments discussed above. Instead, BLM deferred any analysis and management changes for those grazing allotments until the agency issued a final resource management plan governing the Safford District of the BLM, wherein the SPRNCA is located.

46.     But when BLM approved its Safford District Resource Management Plan ("Safford RMP") in 1991, the agency *did not* examine the ecological impacts of livestock grazing on those four allotments within the SPRNCA. Instead, BLM asserted such issues were adequately "considered" in earlier programmatic analyses that pre-dated both the Riparian Plan and the creation of the SPRNCA, even though these earlier analyses failed to evaluate and address the impacts of livestock grazing on the Babocomari, Brunckow Hill, Lucky Hills, and Three Brothers allotments.

47.     Nevertheless, through the Safford RMP, BLM decided to allow harmful grazing to continue on those grazing allotments—the Babocomari, Three Brothers, Lucky Hills, and Brunckow Hill—within the SPRNCA. In so doing, BLM applied the 1989 Riparian Plan terms and conditions to the recently-acquired lands, but exempted these lands from the 1989 Riparian Plan's prohibition on livestock grazing. BLM specifically

17

noted that the grazing leases in place at the time of the federal acquisition will be "recognized for the term of these leases." These grazing leases were set to expire in 1996.

48.     In the Safford RMP, BLM allowed grazing despite the serious concerns of several state and federal agencies.  The U.S. Fish and Wildlife Service "strongly" objected to grazing those lands, opining that "grazing is not compatible with the congressionally mandated purpose of the RNCA" and that "protection and restoration cannot be fully realized in the presence of livestock grazing."  Similarly, the Arizona Department of Environmental Quality opposed BLM's proposal to allow livestock grazing along the rivers in the San Pedro NCA, because livestock grazing is a "significant contributor[]" to the degraded conditions within the area.  The U.S. Environmental Protection Agency ("EPA") also expressed "serious concerns" about the lack of adequate analysis of the direct, indirect and cumulative impacts of livestock grazing on the natural resources within the area.

49.     In the Safford RMP, BLM did agree to "improve" conditions within these allotments, stating that it would prepare allotment management plans, which would "provide for continued livestock grazing and protection of the riparian values of the National Conservation Area."  But upon information and belief, nearly thirty years later, BLM has not issued any final allotment management plans for the Babocomari, Three Brothers, and Lucky Hills allotments.

**V.     Notice of Intent and Analysis of the Management Situation**

50.     On April 30, 2013, BLM published a Notice of Intent to Prepare a Resource Management Plan for the San Pedro Riparian NCA and associated environmental impact statement.  78 Fed. Reg. 25299 (April 30, 2013).  Publication of the notice of intent commenced the public scoping process, and BLM invited public comments on the issues it should examine in the resource management plan and environmental reviews.

51.     Western Watersheds, the Center, the Sierra Club, and many of their

members, and hundreds of others submitted scoping comments to BLM.  Many of these

comments requested BLM adhere to the requirements of the Arizona-Idaho Conservation

Act and prohibit all livestock grazing with the SPRNCA.

52.     In 2017, BLM issued the San Pedro Riparian Conservation Area Analysis

of the Management Situation Report ("AMS"), which describes the physical and

biological characteristics and condition of the resources within the San Pedro Riparian

NCA.

53.     In a key finding, the AMS concluded that "neither the *Safford RMP* nor the

*Riparian Management Plan* provide clear goals and objectives to guide protection and

conservation of the nine conservation values [of the San Pedro Riparian NCA] identified

in [the Arizona-Idaho Conservation Act.]"

54.     The AMS concluded that existing management was not protecting uplands

and uplands soils in the SPRNCA, and that these areas required restoration. The AMS

attributed the degraded condition of the upland soils to several factors, including

livestock overgrazing, soil erosion and lower levels of vegetation ground cover,

particularly in the northern portion of the SPRNCA.

55.     The AMS also concluded that the riparian and aquatic resources protected

under the Arizona-Idaho Conservation Act were being "threatened," and that only about

half of the SPRNCA's riparian-wetland areas were meeting the management standards

required under the Act.

56.     The AMS similarly concluded that vast portions of the riparian areas along

the San Pedro River were in degraded condition, with nearly one-half (23.4 of 50.8 miles)

of the entire stretch of the San Pedro River in the SPRNCA failing to meet desired

conditions.

57.     The AMS also noted that unauthorized livestock use along the river contributed to the degraded conditions of the riparian vegetation and habitat.  To meet the statutory requirement to "conserve, protect and enhance" riparian conditions, BLM noted that "continued recovery in *all* reaches [of the San Pedro River] is necessary," and "[i]mprovement is needed in the amount of stabilizing vegetative cover."

58.     In the AMS, BLM found these same degraded conditions along the Babocomari River within the SPRNCA too, especially in the lower reach where it joins with the San Pedro River. BLM attributed the degraded conditions to disturbance from livestock trampling and overutilization of forage.

59.     In the AMS, BLM also completed an assessment of conditions of the eight wetlands in the SPRNCA, and concluded that seven of these areas were failing to achieve desired conditions. The AMS attributed these poor conditions to repeated trampling and heavy grazing by livestock.

60.     The AMS noted that current and historic authorized and unauthorized livestock grazing was inhibiting and slowing recovery of riparian, wetland, and upland habitats across the San Pedro Riparian NCA.

61.     The AMS forecasted that under current management conditions, any improvement in wetland vegetation and habitat conditions would take decades.

62.     In the AMS, BLM concluded that the existing management objectives for wetland vegetation are not consistent with the requirements of the Arizona-Idaho Conservation Act to "conserve, protect, and enhance" wetland habitat and vegetation.

63.     Similarly, the AMS concluded that its current management is inadequately protective of fish and wildlife habitat, and identified opportunities to restore these areas from prior "intensive livestock grazing."  In the AMS, BLM admitted that its current management priorities for special status species and habitat are "out of date" and "no longer relevant."

**VI.    Draft RMP and Environmental Impact Statement**

64.    In June 2018, BLM issued its Draft Resource Management Plan and Environmental Impact Statement (DEIS), which analyzed and described four alternatives for managing the San Pedro Riparian NCA.

65.    According to BLM, one of the underlying purposes of the DEIS was "to evaluate the effects of livestock grazing on the SPRNCA," and "to determine where and how livestock grazing could be compatible with the values of the National Conservation Area (NCA)."

66.    BLM framed the "need" for this analysis as "evaluating the effects of livestock grazing on the SPRNCA for the portions of the SPRNCA that were not acquired through the state land exchange."

67.    Based on this stated purpose and need, BLM examined four alternatives, including:

- *Alternative A* – The so-called "no action" alternative, where BLM proposed to continue to administer the lands within the SPRNCA under the terms of the 1989 San Pedro Riparian Management Plan and the Safford District RMP.  Under this approach, BLM would continue to allow livestock grazing on 7,030 acres on four allotments totaling 592 AUMs, and vegetation (restoration) projects would be permitted on a case-by-case basis.

- *Alternative B* – Under this alternative, BLM would emphasize increased public and recreational use, allow livestock grazing across the entire San Pedro Riparian NCA totaling 13,332 AUMs, and would allow extensive vegetation treatments using chemical, biological, mechanical and prescribed fire across all vegetation types.

- *Alternative C* – Alternative C was BLM's preferred alternative, wherein BLM would allow livestock grazing in the upland portions of SPRNCA

21

totaling 3,955 AUMs, and permit extensive vegetation treatments using chemical, biological, mechanical and prescribed fire across 26,284 acres within SPRNCA across all vegetation types.

- *Alternative D* – Under this alternative, BLM would prioritize resource protection and conservation, and BLM would prohibit livestock grazing in the SPRNCA and limit all vegetation treatments to using natural processes or hand tools only (i.e., barring the use of chemical, biological, mechanical and prescribed fire for vegetation treatments).

68.     In the DEIS, BLM acknowledged that livestock grazing permitted under Alternatives A-C "would have direct and indirect impacts on vegetation communities." More specifically, BLM identified the risks of grazing in areas already degraded by livestock grazing, noting that "even low utilization may cause adverse impacts on vegetation."

69.     BLM then noted that under Alternatives A-C, relatively large areas would be open to grazing in the Lucky Hills and Three Brothers allotments.  According to BLM, it would use vegetation treatments, best management practices, and adaptive management to minimize and reduce adverse impacts on vegetation.

70.     The DEIS identified no best management practices for livestock grazing within areas that have departed from healthy condition.

71.     In the DEIS, BLM also reconfirmed that 10,650 acres within the SPRNCA contain soils that are highly susceptible to wind erosion, and 54,250 acres have a moderate rainfall stability rating. In Alternative C, BLM proposed to continue to allow livestock grazing on these areas with a "high" susceptibility to wind erosion, and moderate susceptibility to rainfall erosion, including within the Babocomari, Three Brothers, Lucky Hills, and Brunckow Hill allotments.

72.     The DEIS contained no analysis of the impacts of grazing on these highly erodible areas within these allotments, even though BLM acknowledged that these areas are "extremely susceptible" to impacts and are "more difficult to restore or reclaim after disturbance."

73.     BLM also acknowledged that, following disturbances from livestock grazing, vegetation treatments and other ground disturbing activities, the risk of soil instability increases as soil slopes approach 30 percent grade. In the DEIS, BLM never identified which areas within the SPRNCA have slopes of 30 percent grade or higher. Instead, BLM noted only that it would use best management practices and standard operating procedures "to minimize or avoid impacts on steep slopes . . . , and, therefore, steep slopes are not included in the analysis [] for sensitive soils."

74.     In its preferred alternative – Alternative C – BLM also proposed to permit vegetation treatments across 27,460 acres within the SPRNCA, as described below. BLM noted that it "foresee[s] multiple vegetation treatments in the same locations, that is, overlapping treatment." The 27,460 acres of vegetation treatments do not include this overlap; thus, some of these acres may be subjected to more than one treatment. BLM identified three types of vegetation treatments, including:

- *Prescribed Fire* – Alternative C proposed to allow 17,070 acres of prescribed fire across the SPRNCA, including on 5,860 acres with a high soil erosion hazard and 10,020 acres with a moderate soil erosion hazard.
- *Mechanical Treatment* – Alternative C proposed to allow 6,130 acres of mechanical treatments across the SPRNCA, including on areas with soils with a high soil erosion hazard and other sensitive soils. Mechanical treatments include so-called "grubbing," during which an operator drives heavy equipment directly over soils to remove vegetation.

23

- *Herbicide Treatment* - Alternative C proposed to allow 11,040 acres of herbicide treatments across the SPRNCA, including on areas with soils with a high soil erosion hazard and other sensitive soils. In this treatment, BLM would directly eliminate vegetation using an unnamed herbicide, which could impact target and nontarget vegetation alike.

75.     BLM noted that prescribed fire would "leave the ground surface bare and, therefore, more susceptible to erosion by wind and water." BLM failed to examine the impacts of prescribed fire on these areas with a high and moderate soil erosion risk, and BLM never explained how increasing risks of soil erosion meets BLM's statutory mandate to conserve, protect and enhance the conservation values of the SPRNCA.

76.     BLM also noted that mechanical treatments can result in soil compaction, dislodging of sensitive soils and disturbance to existing vegetation.

77.     BLM acknowledged the potential for overlapping vegetation treatments to have cumulative impacts, noting, "potential surface disturbance associated with subsequently authorized mechanical treatments could increase weed establishment and spread, and chemical treatments could affect nontarget vegetation from herbicide drift or accidental spills." BLM never examined the cumulative impacts on these additive vegetation treatments on the riparian, aquatic and wildlife habitat resources within the SPRNCA, however.

78.     In the DEIS, BLM proposed to permit vegetation treatments across 26,060 acres of priority wildlife habitat, which would lead to a "loss of vegetation" in these areas, and therefore "loss of priority habitat for wildlife." Again, BLM failed to examine the impacts of vegetation treatments on priority wildlife habitat, and BLM never explained how destroying priority wildlife habitat meets BLM's statutory mandate to conserve, protect and enhance the riparian, aquatic and wildlife habitat resources of the SPRNCA.

79.     BLM's DEIS generated an outpouring of public opposition.  For example, D. Dean Bibles, the former BLM Arizona State Director who oversaw the creation of the SPRNCA, stated that allowing livestock grazing in SPRNCA is "clearly contrary" to the management requirements flowing from the Arizona-Idaho Conservation Act.  Bibles particularly opposed BLM's grazing alternatives, stating, "At the time of acquisition of the Arizona State Trust lands, there was no intention and therefore no commitment to continue grazing after the outstanding state leases terminated."

80.     Twenty-one leading scientists familiar with the San Pedro Riparian NCA similarly opposed the BLM's preferred alternative, noting that BLM failed to provide the scientific basis for its preferred alternative.  In the absence of scientific support demonstrating that grazing would meet the overarching aims of the SPRNCA, these experts stated that BLM "cannot consider introducing or continuing to allow livestock grazing in the SPRNCA."

81.     In their comments, Western Watersheds and Sierra Club similarly opposed BLM's plan to permit livestock grazing and vegetation treatments in the San Pedro Riparian NCA, and provided a detailed explanation – using BLM's own analysis – of how BLM's proposed alternatives violated NEPA, FLPMA, and the Arizona-Idaho Conservation Act.

82.     The Center also opposed BLM's preferred alternative, noting that the DEIS failed to adequately examine the scientific evidence on the adverse impacts of livestock grazing on the SPRNCA.

83.     The majority of the more than 400 individual public comments opposed BLM's preferred alternative, including BLM's plan to allow livestock grazing in the SPRNCA.

**VII.    Final Environmental Impact Statement and Proposed RMP**

84.    On April 26, 2019, BLM issued its San Pedro Riparian NCA Final Environmental Impact Statement and Proposed Resource Management Plan (FEIS).

85.    In the FEIS, BLM chose as the Proposed Plan a hybrid of the alternatives identified in the DEIS – i.e., BLM proposed to allow ongoing grazing within the four allotments of the SPRNCA consistent with Alternative A; revoke the existing closure of the remainder of the San Pedro Riparian NCA to livestock grazing; and allow the expanded mechanical, herbicide and prescribed fire vegetation treatments proposed in Alternative C.

86.    In addition, BLM added an entirely new scheme into the proposed plan – i.e., one that was never considered in the DEIS, and never subject to public review and comment.  In the FEIS, BLM proposed to expand the vegetation treatments to include so-called "targeted grazing." According to BLM, "targeted grazing" is a vegetation management tool and not part of the livestock forage allocation.

87.    In the FEIS, BLM undertook no substantive analysis on the impacts of continuing status-quo livestock grazing on sensitive soils across the four grazing allotments in the SPRNCA, except to note, in one sentence, that grazing would increase in areas with soils that have a severe susceptibility to erosion from grazing. BLM provided no analysis or discussion of how this increased soil erosion will affect the riparian areas, uplands and wildlife habitat across the SPRNCA, and BLM similarly ignored any discussion or analysis examining whether this increase in soil erosion will "conserve, protect, and enhance" the riparian, wildlife and conservation values of the San Pedro Riparian NCA.

88.    In fact, BLM excluded any analysis of the impacts of continued livestock grazing on the steep slopes with the SPRNCA, admitting "steep slopes are not included in the analysis below."

89.     In the FEIS, BLM also provided no substantive information on its proposal to allow "targeted grazing," such as where, when and/or for how long BLM will allow targeted grazing.  The FEIS is equally devoid of information on what class of livestock will be used, how many livestock will be allowed to graze, who is authorized to graze, whether these livestock will have access to the important riparian and habitat resources within the San Pedro Riparian NCA, and how BLM will ensure that adverse effects do not flow from this increased use, including to the imperiled wildlife species that depend on the SPRNCA for all or part of their respective lifecycles. The FEIS similarly lacked any discussion of possible cumulative effects of targeted grazing together with other livestock authorized in the SPRNCA.

90.     Indeed, the sum total of BLM's "hard look" of the ecological impacts of targeted livestock grazing on the priority conservation resources within the San Pedro Riparian NCA is one thinly-sourced and conclusory paragraph, concluding only that impacts on soils would be "negligible." BLM then repeated this same conclusion for each of the conservation resources BLM is required to conserve, protect, and enhance – including water resources, vegetation resources, fish and wildlife resources, special status species resources, fire and fuels, tribal concerns, and paleontological resources.

91.     Upon information and belief, BLM is using the FEIS to "pilot" this new targeted grazing strategy – in which BLM can permit unlimited livestock grazing anywhere within or outside existing grazing allotments unattached to the underlying grazing permit and livestock forage allocation – for the first time anywhere within a National Conservation Area.

92.     When BLM's targeted grazing strategy is read together with its decision to revoke the moratorium on grazing outside of the four grazing allotments in the SPRNCA, it becomes apparent that BLM has opened the entire National Conservation Area to livestock grazing, with no discussion, analysis, or examination whatsoever. Indeed, BLM

makes this conclusion more obvious by eliminating the requirement that all forage and other vegetation on lands within SPRNCA (outside of the four grazing allotments) be reserved for wildlife and non-consumptive uses.

93.     BLM also built into its Proposed Plan an opaque and undefined "adaptive management strategy," which BLM would subsequently develop to "support increased levels of livestock grazing" within the four allotments within the San Pedro Riparian NCA.

94.     BLM failed to provide any details on its adaptive management approach, including the breadth and scope of BLM's proposed expansion of livestock grazing in the SPRNCA.  Indeed, BLM failed to even provide an upper limit on proposed increases in livestock AUMs, noting only that the permitted animal unit months in the FEIS are "the initial stocking rate."

95.     As with BLM's targeted-grazing scheme, BLM similarly failed to identify where and on which allotment an adaptive management grazing increase may occur, and whether BLM will target riparian areas, wetlands, or important wildlife habitat for increased grazing.  In other words, BLM failed to disclose – much less analyze – the full breadth of its proposed expansion of grazing across the San Pedro Riparian NCA.

96.     In the FEIS, BLM acknowledged that its plan allows prescribed fire and other vegetation treatments (outside of targeted livestock grazing) on almost 16,000 acres of high and moderate soil erosion hazard, which will make these areas more susceptible to increased erosion. Yet, BLM failed to provide any analysis or examination of the impacts of this increased erosion on the San Pedro and Babocomari rivers, riparian areas, and wildlife habitat across the SPRNCA, and BLM similarly ignored any discussion or analysis examining whether this increase in soil erosion will "conserve, protect, and enhance" the riparian, wildlife and other conservation values of the San Pedro Riparian NCA.

97.     On May 27, 2019, the Center and others formally protested BLM's FEIS. The Center protested BLM's authorization of grazing, including within the four allotments, together with its targeted grazing and its so-called "adaptive management strategy" to allow increased grazing across the SPRNCA, as unlawful under the Arizona-Idaho Conservation Act, FLPMA, and NEPA.

98.     On May 28, 2019, WWP and Sierra Club filed its protest, challenging BLM's decision to permit livestock grazing in the Babocomari, Three Brothers, Lucky Hills, and Brunckow Hill allotments; authorize targeted livestock grazing across the entire San Pedro Riparian NCA, and adopt a piloted "adaptive management strategy" allowing future grazing increases across the SPRNCA.  In addition, WWP protested the lack of adequate environmental review of the impacts of these decisions on the conservation priorities in the SPRNCA.

## VIII.  Record of Decision and Approved RMP

99.     On July 30, 2019, BLM issued its Record of Decision and Approved Resource Management Plan (ROD) for the San Pedro Riparian National Conservation Area, in which BLM approved an RMP that is "nearly identical" to the Proposed Plan, and allowed the broadest array of management tools, including use of heavy equipment, herbicide, hand tools, targeted livestock grazing, and prescribed fire. BLM also approved livestock grazing within the four allotments, unspecified targeted livestock grazing across the entire SPRNCA, and adaptive management of livestock grazing to approve increases over past use.

100.    BLM concluded that the RMP is the "environmentally preferable alternative" – and best meets the requirements to conserve, protect, and enhance the conservation values for which the SPRNCA was designated – when BLM considers the "human (social and economic) environment."

101.     In its ROD, BLM deleted any reference to its revocation of the livestock grazing moratorium on SPRNCA lands outside of the four grazing allotments.

102.     BLM also modified its Livestock Grazing Management Actions and Allowable Uses to eliminate its obligation to prepare land health evaluations before "issuing" any new grazing lease within SPRNCA, including any grazing lease associated with BLM's targeted grazing permits. Under the ROD, BLM modified this requirement to only when it is "renewing" an already existing lease. This change excludes BLM's targeted grazing program and so-called adaptive management strategy from NEPA, FLPMA and the Fundamentals of Rangeland Health regulations.  BLM's ROD contained no analysis of the direct, indirect and cumulative impacts of this change on the conservation values for which SPRNCA was designated.

103.     On July 30, 2019, BLM also issued a Director's Summary Protest Resolution Report, summarily dismissing and denying each of the 28 separate protests to BLM's San Pedro Proposed RMP.

104.     In its Protest Response, BLM asserted that "[t]he SPRNCA Proposed Plan does not include adding any additional livestock grazing," and "[a]ll livestock grazing levels proposed under the RMP are the continuation of existing livestock grazing levels." The record and BLM's own admissions belie this assertion.  For example, BLM's ROD acknowledged that the stocking rate of 592 Animal Unit Months (AUMs) permitted on the four grazing allotments represents only the "initial stocking rate," and BLM admitted that the ROD permits an increase in stocking rate under BLM's so-called adaptive management strategy.

105.     BLM also ignored the fact that its ROD lifts the grazing moratorium across the remainder of the San Pedro Riparian NCA, and allows – for the first time in generations – livestock grazing to occur on the steep slopes, sensitive soils, uplands and wildlife habitat across the entire area through BLM's targeted grazing pilot program.

## IX.   Endangered Species Act Consultation

106.   Meanwhile, on May 22, 2019, BLM sent to the U.S. Fish and Wildlife Service ("the Service") a Biological Assessment (BA), ostensibly examining the impacts of BLM's proposed resource management plan on threatened and endangered species within the San Pedro Riparian NCA.

107.   In this BA, BLM concluded that implementing its proposed resource management plan – including the grazing, vegetation treatment and other land use allocations and decisions – may affect and is likely to adversely affect the endangered Huachuca water umbel (an endemic, aquatic plant), desert pupfish, Gila topminnow, southwestern willow flycatcher, and ocelot, as well as the threatened northern Mexican gartersnake and yellow-billed cuckoo.  BLM also concluded that its proposed RMP would adversely affect designated critical habitat for the endangered Huachuca water umbel.

108.   On June 7, 2019, the Service issued its final Biological Opinion ("BO"), concurring with BLM's determination that implementing BLM's resource management plan may affect and is likely to adversely affect these ESA-protected species.

109.   More specifically, the Service concluded that BLM's proposed vegetation treatments – including targeted grazing, herbicide, prescribed fire and mechanical treatments –  "may result in adverse effects" to endangered southwestern willow flycatcher, desert pupfish, Gila topminnow, and Huachuca water umbel, and threatened northern Mexican gartersnake, and yellow-billed cuckoo.

110.   The Service concluded that BLM's proposed grazing on the four allotments was covered by prior consultations, so did not address the effects of such grazing in the

BO.  However, BLM and the Service never consulted over the impacts of BLM's grazing authorizations within the four allotments on these endangered and threatened species.[3]

**FIRST CLAIM FOR RELIEF:**
**VIOLATION OF NEPA AND THE APA**

111.    Plaintiffs reallege and incorporate by reference all preceding paragraphs.

112.    NEPA requires federal agencies to study the environmental impacts of proposed actions and the reasonable alternatives that would avoid or minimize such impacts or enhance the quality of the human environment.  42 U.S.C. § 4332(2)(C); 40 C.F.R. Pt. 1502.  Aimed at informed agency decision-making and meaningful public participation, NEPA's "action-forcing" procedures require agencies to, among other things: properly define proposals, develop a reasonable "purpose and need" statement to frame the environmental review, consider a reasonable range of alternative actions, establish an accurate baseline for analysis, ensure the professional and scientific integrity of its discussions and analyses, include all information that is "essential to a reasoned choice," and discuss mitigation measures including the effectiveness of those measures. *See, e.g.*, 40 C.F.R. §§ 1500.1(b), 1500.2(b), 1502.1, 1502.4(a), 1502.13, 1502.15, 1502.22(a), 1502.24, 1508.20.

113.    BLM has violated NEPA and its implementing regulations through approval of the July 30, 2019 ROD and the accompanying FEIS. These violations include, but are not limited to:

a.    Relying upon an unreasonably narrow "purpose and need" statement to constrain BLM's analysis and eliminate reasonable alternatives that would have supported the basic purpose of the San Pedro RMP: to "conserve, protect, and

---

[3]  On March 30, 2020, Plaintiffs provided to Federal Defendants BLM *et al.* and the U.S. Fish and Wildlife Service a Notice of Intent to Sue for Violations of the Endangered Species Act Relating to BLM's Approval of the San Pedro Riparian National Conservation Area Resource Management Plan, as required under Section 10 of the Endangered Species Act.  16 U.S.C. §§ 1359.  Once this notice becomes ripe, Plaintiffs will amend this Complaint to allege violations of the ESA.

enhance" the aquatic, riparian, wildlife, wilderness and other conservation values of the San Pedro Riparian National Conservation Area;

b.      Failing to consider a reasonable range of alternatives, including failing to fully consider viable and feasible alternatives offered by the public during the NEPA process;

c.      Failing to establish an accurate environmental baseline on key environmental and ecological factors within the San Pedro Riparian NCA;

d.      Failing to take a "hard look" at the direct, indirect and cumulative impacts of BLM's approved grazing scheme, BLM's targeted livestock grazing approach, vegetation treatments and removals, and the "adaptive management strategy" authorized and permitted within the San Pedro Riparian NCA;

e.      Improperly relying on unproven and inadequate best management practices or BMPs and an unproven and undefined "adaptive management strategy" to minimize likely impacts to aquatic, riparian, wildlife, wilderness and other conservation values of the San Pedro Riparian National Conservation Area; and

f.      Ignoring the mountain of scientific evidence, including the correspondence from sixteen leading scientists, establishing that livestock grazing is inconsistent with managing for the conservation values that Congress designated the SPRNCA; and

g.      Failing to supplement the DEIS after making substantial changes to the proposed actions and adding alternatives that were not analyzed and subject to public comment in the draft EIS. 40 C.F.R. § 1502.9(c). Major changes since the DEIS include BLM's adoption and approval of its so-called targeted grazing and adaptive management strategies to support increased levels of livestock grazing within the SPRNCA.

33

114.     Accordingly, the ROD, RMP, and the accompanying Final EIS are arbitrary, capricious, an abuse of discretion, not in accordance with law, without observance of procedure required by law, and/or in excess of statutory jurisdiction, authority, or limitations within the meaning of the judicial review provisions of the APA; and must be held unlawful and set aside under 5 U.S.C. § 706(2).

WHEREFORE, Plaintiffs pray for relief as set forth below.

### SECOND CLAIM FOR RELIEF: VIOLATION OF THE
### ARIZONA-IDAHO CONSERVATION ACT, FLPMA, AND THE APA

115.     Plaintiffs reallege and incorporate by reference all preceding paragraphs.

116.     In the Arizona-Idaho Conservation Act, Congress created the San Pedro Riparian National Conservation Area to "protect the riparian area and the aquatic, wildlife, archeological, paleontological, scientific, cultural, educational, and recreation resources of the public lands surrounding the San Pedro River." 16 U.S.C. § 406xx(a).

117.     The Arizona-Idaho Conservation Act requires that the Secretary of the Department of the Interior – acting through the BLM – "shall manage the [San Pedro Riparian National] conservation area in a manner that conserves, protects, and enhances the riparian area and the aquatic, wildlife, archeological, paleontological, scientific, cultural, educational, and recreation resources of the conservation area." *Id.* at §460xx-1(a). The Arizona-Idaho Conservation Act requires that BLM "shall only allow uses of the conservation area as he finds will further the primary purposes for which the conservation area is established." *Id.* at § 460xx-(1)(b).

118.     BLM's own data and the mountain of scientific evidence in the record establishes that BLM's existing grazing scheme on the Babocomari, Three Brothers, Lucky Hills and Brunckow Hill allotments is harming the riparian, aquatic and wildlife habitat for which Congress created the San Pedro Riparian NCA, and BLM's new grazing schemes (including permitted grazing within the four allotments, targeted grazing

and grazing increases under BLM's adaptive management approach) approved in the ROD and RMP increases livestock grazing on these allotments.  As such, BLM is failing to adhere to the Arizona-Idaho Conservation Act's management requirement to "conserve, protect, and enhance" these conservation values.

119.    In addition, BLM's own monitoring data and conclusions show that allowing additional livestock grazing in the uplands within the SPRNCA – as BLM's targeted livestock grazing approach would allow – will increase adverse livestock impacts on wildlife habitat, cultural resources, and water resources," and that these impacts would "conflict with the protections afforded to conservation values by the enabling legislation."

120.    Yet, BLM's ROD and RMP allow additional livestock grazing in uplands of the San Pedro Riparian NCA despite these adverse impacts, in direct contravention of the requirements of FLPMA and the Arizona-Idaho Conservation Act to "conserve, protect and enhance" these values.

121.    Finally, BLM's ROD and RMP failed to provide a rational explanation how continuing and expanding grazing in the SPRNCA through both its targeted grazing and adaptive management strategies complies with its legal duties under the Arizona-Idaho Conservation Act, especially in light of the record evidence showing it does not.

122.    Accordingly, BLM's ROD and RMP are arbitrary, capricious, an abuse of discretion, and not in accordance with law under FLPMA, the Arizona-Idaho Conservation Act, and the APA, which has caused or threatens serious prejudice and injury to the rights and interests of Plaintiffs and their members and staff.

WHEREFORE, Plaintiffs pray for relief as set forth below.

## PRAYER FOR RELIEF

Plaintiffs respectfully request that the Court grant the following relief:

A.     Order, adjudge, and declare Defendants violated NEPA, FLPMA, the Arizona-Idaho Conservation Act, and/or the APA in approving the July 30, 2019 ROD, Approved RMP and accompanying FEIS;

B.     Reverse and set aside the Record of Decision, Approved Resource Management Plan Amendment and the accompanying Final Environmental Impact Statement, and remand them to Defendants;

C.     Issue declaratory and/or injunctive relief requiring Defendants to adhere to the requirements of NEPA, FLPMA, the Arizona-Idaho Conservation Act and the APA in their ongoing and future management of the San Pedro Riparian NCA;

D.     Enter such other declaratory and/or injunctive relief as Plaintiffs may specifically request hereafter;

E.     Award Plaintiffs their reasonable costs, litigation expenses, and attorney's fees associated with this litigation under the Equal Access to Justice Act, 28 U.S.C. §§ 2412 et seq., and/or all other applicable authorities; and/or

F.     Grant such further relief as the Court deems necessary or appropriate in order to remedy Defendants' violations of law, vindicate the interests of Plaintiffs and the public, and preserve and protect the public lands and resources at issue.

Dated this 1st day of April, 2020.                    Respectfully submitted,


/s/ Todd C. Tucci
Todd C. Tucci, *pro hac vice*
Idaho State Bar # 6526
**ADVOCATES FOR THE WEST**
P.O. Box 1612
Boise, ID 83701
(208) 342-7024
ttucci@advocateswest.org

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

Elizabeth Potter, *pro hac vice*
Oregon Bar # 105482
**ADVOCATES FOR THE WEST**
3701 SE Milwaukie Ave., Ste. B
Portland, OR 97202
(503) 914-6388
epotter@advocateswest.org

*Attorneys for Plaintiffs*